Good afternoon, ladies and gentlemen. Court will now call Case 118585 in re Pension Reform Litigation, Doris Heaton et al. v. Pat Quinn, Governor of Illinois. Are you ready to proceed? Both sides? You may proceed. May it please the Court. Counsel. Counsel. I am Carolyn Shapiro, Illinois Solicitor General for the Defendants. When the Illinois Pension Clause was adopted in 1970, it marked a sea change in the law. Before 1970, most public pensions were statutory gratuities, which meant they could be revoked by the legislature at will. The Pension Clause transformed them into enforceable contractual relationships, removing that legislative prerogative. The issue before the Court today is whether, as defendants argue, the Pension Clause provides the same robust but not absolute constitutional protections provided to all contracts, or whether, as plaintiffs argue and the Circuit Court held, the Illinois Pension Clause goes far beyond contractual protections and is instead a categorical and absolute ban on any reductions to pensions, even under extraordinary circumstances, that would otherwise justify the use of the state's police power to modify other contracts. Plaintiffs' position is remarkable. If there were prolonged deflation, such that every penny of state revenue was going to pay pensions, no changes could be made. If the state's bond rating collapsed, rendering borrowing prohibitively expensive, pensions would be entirely off limits, regardless of the essential state services that might have to be eliminated. And if there were a catastrophic epidemic or a natural disaster, pensions could not be even temporarily reduced, even at the expense of life-saving services for most of the state. Now, these scenarios may seem extreme. They are. But that is what plaintiffs are asking for. It is the state's solemn responsibility to protect the public interest, public health, safety, and welfare in extreme situations. But the necessary consequence of what plaintiffs are demanding and the Circuit Court agreed to would tie the state's hands when its need to act is most pressing. We cannot emphasize enough the reality that accepting plaintiffs' absolutist reading of the Pension Clause has effects that go far beyond this case. Defendants' reading of the text establishes the unremarkable proposition that the protections of the Pension Clause are equivalent to the protections of the Contract Clause, which, like the Pension Clause and many other constitutional provisions, contains absolute language, but as this Court has said, is not to be read with literal exactness like a mathematical formula. Defendants' understanding is faithful to the Pension Clause's text and in particular to the promise of an enforceable contractual relationship which is at the very heart of the clause. It is faithful to the purpose to raise public pensions from gratuities to contracts, and it is consistent with the history of the clause. Finally, it is confirmed by this Court's subsequent precedent, which has clearly identified public pensions as contracts. In contrast, plaintiffs ask this Court to say that the Pension Clause goes far beyond elevating public pensions to contracts and instead turns them into a new and unheard-of absolute right. That is not what the clause says. That is not what the clause was intended to do. That is not what the delegates to the Constitutional Convention discussed, and that is not how this Court has ever read the clause. Plaintiffs' reading also, at a minimum, raises serious federal constitutional concerns. And it is such a radical reading, would have been such a momentous departure from the settled background law that the delegates are presumed to have known, that it should not be presumed in the absence of explicit and unmistakable language, language that is in neither the clause itself nor in the Constitutional Convention debates. Now, before talking about the text, the purpose, the history, and the precedent, I do want to say a little more about defendants' reading of the clause, because plaintiffs have tried very hard in their briefs to scare us, to argue that defendants' reading essentially means the clause does nothing, that it creates a moral hazard under which the legislature could simply choose to ignore its pension obligations and then declare an emergency, or that it could simply decide it has other priorities besides pensions. This argument presents a false choice, and it mischaracterizes our position. This case does not present a choice between plaintiffs' absolutist reading and no meaningful protection at all. As we've already noted, the pension clause provides the same protection available under both the federal and state contract clause, as articulated by this Court and the United States Supreme Court for more than a century and a half. Those protections may not be absolute, but they are significant. And as this Court has recognized, it is rare for courts to allow the alteration of contracts pursuant to a state's police power. And even when such alterations are justified, they must be tailored to the situation at hand. So reading the pension clause as allowing for the exercise of police powers under extraordinary circumstances does not mean that this case is over. To the contrary, while plaintiffs' absolute reading would preclude defendants from providing any justification or evidence in support of the Pension Reform Act that is at issue here, under the correct reading of the clause, the circuit court will on remand have the opportunity to consider evidence and conclude on a full factual record whether the circumstances justify the act. So let's turn to the text of the pension clause. It says, in relevant part, membership in any public pension or retirement system of the state shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired. So the pension clause explicitly creates a contractual relationship. And as this Court explained in Budell, pension benefits are, quote, contractual in nature and cannot be altered except in accordance with usual contract principles, unquote. So like all contracts, they can be altered. They are not absolute. And everyone in our case apparently agrees that as we explained in our opening brief, it is an ordinary contract principle that contractual relationships are subject to the limitation on the basis of the state's police power. It's a basic background principle of law that, as this Court explained in Kenerva, the drafters are assumed to have known. Now, after the clause establishes public pensions as enforceable contractual relationships, the clause says that the benefits of that contractual relationship shall not be diminished or impaired. Now, defendants would have you believe that this language sweeps away 150 years of precedent on contractual relationships and confers an absolute protection unheard of in American contract law. But the diminish and impair language simply cannot bear that weight. First, the diminish and impair language refers back to the enforceable contractual relationship. It says that the public pensions are enforceable contractual relationships, the benefits of which shall not be diminished or impaired. It does not say that public pension benefits shall not be diminished or impaired. Second, the language tracks the contract clause, which everyone agrees, despite its absolute language, is not in fact absolute. The Illinois contract clause provides a relevant part that no law impairing the obligation of contracts shall be passed. So the pension clause's promise not to impair exactly parallels the conceitedly non-absolute contract clause. The addition of the word diminish simply cannot do all of the work that plaintiffs claim. For one thing, diminishment is a form of impairment, and the terms are largely interchangeable in the context of contract clause jurisprudence. For another thing, plaintiffs' reading of the diminish and impair language reads the contractual relationship out of the clause entirely. If public pensions have an absolute protection, then they are not contractual relationships. In fact, if they have an absolute protection, then a variety of different contract doctrines, such as novation, that might, under some circumstances, allow for the reduction of pensions, cannot apply. In other words, plaintiffs' reading creates not just surplusage, but an internally inconsistent clause that's at war with itself. In contrast, defendants' reading harmonizes the different parts of the clause and reads the diminish and impair language as reaffirming the enforceable contractual relationship. And as I will explain,  for why the diminish and impair language appears in the clause. I'm going to talk now a little bit about the purpose and history. If you turn to the debate... So in your brief, you state that if this court agrees with your argument that, quote, this court will not be granting the state a license to modify its own contractual obligations whenever it merely prefers not to fulfill those obligations. Yes. You remember that phrase, right? But isn't that, in fact, exactly what we would be doing? If the court holds that the state can invoke its police powers to violate core constitutional guarantees to respond to an emergency that, at least arguably, the state itself created, then aren't we giving the state the power to modify its contractual obligations whenever it wants? For instance, the state could simply fail to fund the pension systems and then claim an emergency, correct? No, that's not correct. For several reasons. First of all, invoking the police powers is not something that the state can do willy-nilly. It can only occur in the context of the need to address an important public purpose. And the courts do agree that a serious fiscal crisis can be such an important public purpose. And what we are asking this court to do is no different from what this court and the United States Supreme Court have done for many years with respect to the Contracts Clause, including with respect to contracts entered into by the state itself. If there's an important public purpose, then the courts look to a variety of factors to see if the exercise of the police power was reasonable and necessary under the circumstances. One of the factors that the courts look to is whether or not the impairment is unforeseen and unintended. Let's talk about that for a minute. Yes. And I don't want to spend too much time on factual matters since you're raising a legal issue. Nevertheless, you've included a statement of facts in your brief setting forth how you believe the state got to the point it is at now. Yes. So I wanted to ask you a couple of things. First, you blame the problem that the pension systems are now in on the recession of 2008 through 2010. In large part. How do you think the pension systems would have weathered that recession if they had been fully funded? The pension systems might well have weathered that recession better, but the recession was a really, truly unforeseeable event. Of course, economic cycles are foreseeable, but a recession of the depth and length of the Great Recession was not foreseeable. Given that, and given the fact that the state had, in 1994, established a new pension funding regime that it was following, it was on pace to be fully funded under that regime on time, it was not simply ignoring its pension obligations. And then when a rather ordinary recession that might in fact be foreseeable came along, claimed an emergency. I guess we can argue about how foreseeable recessions are, and even bad recessions, but no matter how much you want to point toward the recession, isn't it true, and I think you've already said so, that the state left the funds vulnerable to the recession in the first place? It is true that the funds were not fully funded. So what do we do with the blame ultimately going back to the state? Well, first of all, let me say this is a merits question. If your concern is what the state should have done differently, whether the state was acting appropriately, that's a question for the Circuit Court on remand. However. Yeah, I have to talk to you about that, too. I don't want to monopolize here, but since you brought that up, in your motion for an accelerated docket, you insisted that the case needed to be expedited so that the General Assembly would have an answer on the law's constitutionality by the end of May. But in your brief, and now, you ask us merely to answer a legal question and then send the matter back to the trial court for fact-finding. And presumably, once the trial court ruled on remand, another set of appeals would ensue. So wouldn't granting you the relief you request preclude an answer being reached on the law's constitutionality by the end of May, which is why we're arguing this case today? It would, in fact. And, of course, we very much hope and expect that our arguments will be persuasive to you and that you will, in fact, remand. But were you not to, it would be very important for the General Assembly to know that as soon as possible. In response to the fiscal emergency, has the legislature acted to impair any existing contractual rights of any others, like unsecured creditors or bondholders or vendors or anyone? Or should we consider that? On remand, that is a relevant question. What else has the legislature done? And, in fact, the legislature has impaired other contracts. For example, it pays vendors significantly in arrears. I believe at the moment it's something like $7 billion behind in its payments to vendors. That is also a type of impairment of contract. To return to Justice Thomas' question about whether or not the state left itself vulnerable and, therefore, can invoke its police powers, one of the other factors that courts look to is to what extent is the impairment appropriately targeted. It would, quite frankly, not be a reasonable exercise of the police powers for the General Assembly to say, for example, we're just going to stop paying current retirees' pensions altogether. That might solve our problem. It might solve our problem entirely. But that would not be a reasonable exercise of the police powers. What the General Assembly did here is to say that it was going to ask the retirees to reduce the amount of money that they would be receiving, the amount of increases that they would be receiving in the future. Nobody's pensions are going to be cut in absolute dollars. It simply reduces future increases. And the total amount saved by the Pension Reform Act is only about 20 percent of the total unfunded liability. It's far less than the total amount that is attributable just to the Great Recession, and it does not ask the retirees to help pay for the past underfunding of the pension system. And the reason these police powers should be invoked is because the dire situation that the state is in, right? Yes. Any incongruity between that and the income tax reduction by 25 percent? That is, again, a merits question. Whether or not the state can invoke its police powers in this context and use those powers as it did, one of the other factors is what other alternatives has it looked at? I think it's fair to say that the budget situation in our state is not yet fully resolved. So the fact that the income tax expired may well be relevant on remand, but it's not relevant here today. And, in fact, the courts have been clear that raising taxes alone can't always be the answer to a fiscal crisis when the state might otherwise want to use its police powers. In Fetout, for example, the United States Supreme Court indicated that in the Buffalo Teachers case, the Second Circuit said this quite explicitly. If that were the case, that raising taxes is always the answer to the fiscal crisis, then fiscal crises could not justify the use of the police powers, and the courts have been clear that they do under the contract clause. I'd like to return for a moment to what the delegates were doing when they brought the pension clause into the Constitution. At the point that it came into the Constitution, there was an unanticipated, an unexpected problem that the Convention faced, and that was the implications of its home rule changes. One of the major changes of the 1970 Constitution was the adoption of home rule powers for municipalities. What this turned out to mean, as local workers started to figure out during the Convention, was that local municipalities could take advantage of the gratuitous nature of pensions under the prior law and revoke them completely, which, for understandable reasons, made municipal workers very nervous. So in the middle of the Convention, there was this scramble to find a solution to the problem. The solution to the problem was borrowing New York's clause. It was not separately drafted. It was simply borrowed from New York with very minor changes. So we should look at what New York was doing, as this Court has indicated. When it enacted its clause, it was enacted in 1938, and it did so quite explicitly because it wanted to change the status of public pensions from gratuities to contracts. But New York doesn't have a contract clause in its Constitution. So in order to provide the same constitutional protections that might otherwise be provided, New York had to add some language to its pension clause, and that's where the diminish and impair language comes in. It used the words diminish and impair because those were the words used in the cases it was responding to. What do we do with the clear evidence from the Constitutional Convention that shows that the framers' intent in enacting the pension clause was to ensure that in trying economic times, what we have here, that the state would not attempt to diminish pension benefits? May I? My time has expired, but you may answer. I don't agree that that is entirely the clear intent. If you read the debates from all the way through, the clear intent is to provide contractual relationships for pension benefits. It is true that one of the reasons to provide those benefits is to provide workers with security so that they would know that they would have financial support in retirement. And that is why in the exercise of the police powers, it is important to look to see what the state has actually done. Here, again, the state has not reduced anybody's pension. It has not eliminated anybody's pension. Would you agree that's problematic if we believe that was the intent of the framers? Isn't that what we're supposed to do with constitutional questions, to ascertain and give effect to the intent of the framers? Of course. I do agree that it would be problematic, but it would be problematic for several reasons. And one is that it would raise a serious federal constitutional concern, that the delegates actually gave away a fundamental attribute of sovereignty without actually saying so explicitly. So I would argue that that alone would raise issues of constitutional avoidance that shouldn't inform your reading of the clause. But if you really think that's what the delegates intended, there's a difficult federal constitutional question that is implicated, and we would argue, frankly, it is unconstitutional to read the clause to give up this core attribute of sovereignty for all time. Thank you. Thank you. May it please the Court. Chief Justice Garmon, members of the Court. My name is Gino DeVito. I represent the Heaton plaintiffs, and today I am proud to speak on behalf of all of the plaintiffs. I've been allotted 15 minutes of time, five minutes to Aaron Madoff, who will speak on behalf of SUA and the collective plaintiffs. This is a case about a constitutional provision, one that is explicit, clear, and unambiguous, and that is subject to no stated exception. The state has not cited a single case where the reserved sovereign powers and police powers have been held to override a constitutional provision, and that's because there is no such case. Our analysis concerning the meaning of the Pension Protection Clause and whether it is subject to the state's police power follows this Court's mandates. First, to consider the words themselves of the provision. Second, to consider the drafter's intent. And third, obviously, to consider this Court's prior opinions. And that's what we've done. When we look at the meaning, when we seek meaning in the Pension Protection Clause, we note, first of all, that the clause is a stand-alone independent provision, not part of the Contract Clause, subject to no exceptions, such as the police power, which is an exception explicitly stated in regard to the right to bear and keep arms. We note that the Pension Protection Clause has plain, clear, unambiguous language, with, again, no stated exception. We note that that language is so simple and plain that the voters' guide concerning the 1970 Constitution, the guide for the voters to aid them in understanding what they were voting for, simply said, this section is new and self-explanatory. Indeed, the words in the Pension Protection Clause are just that. They are self-explanatory. They have common meaning. And this Court has said over and over again that the first and foremost canon regarding constitutional interpretation is the plain words, the plain meaning of the words. These words are understood by everyone. We look to the drafter's intent. We realize first when we review the debate at the Constitutional Convention that the drafters anticipated the very situation that this Court is now reviewing, a General Assembly that invokes fiscal problems, a lack of money, in order to invalidate a constitutional protection. We note in determining what the intent of the drafters is that they wanted to create two things. First, and with certainty, as the Solicitor General has said, a contractual relationship, a contract that was binding, not as was the law until the 1970 Constitution, one where many pension benefits were gratuitous. What they intended to create was a binding contractual relationship, one enforceable in law. And I'm paraphrasing what the drafters actually talked about, what the discussion was. A binding contractual relationship that was not based upon gratuity. So the first thing they were addressing was who is covered by pension protection. And the answer to that is every public employee who is part of the pension system. And the second thing they did, and this is clear from the debate, they explicitly said we want to create two things. The first one I've already talked about. And the second one is to ensure that the pension rights they were talking about were guaranteed. And thus the language that says that benefits shall not be diminished or impaired. Those two things were the object of this constitutional convention. And they succeeded mightily. Because anybody who reads that provision, the pension protection clause, can't walk away with any other interpretation. We get all kinds of nuances about the contract clause and all of that, but it's clear in meaning. And, again, the first canon that this court applies concerning interpretation is that how plain and how clear, what do the words say? That's what they say. That was the intention of the drafters. And this isn't just my opinion. This is this court's opinion. This court has countless times. All right, that's a bit of an exaggeration. This court has numerous times reviewed this clause. And has said just that, has recognized that that was the intent of the drafters. Another intent that the drafters had was to force, to indirectly force, the General Assembly to fund in an adequate way the pension systems. The drafters knew that up until 1970 and beyond, as it turns out, the pension systems were grossly underfunded. And they've been underfunded ever since. Today they're as underfunded as they were back in 1970. They wanted to indirectly persuade, force the General Assembly to fund these systems adequately by conveying to them the fact that these obligations were real, that the benefits could not be diminished. And that's the way they did it. Does the police power ever allow them to impair these pensions under any circumstances? Your Honor, certainly not under these circumstances. Certainly not. It is absolutely clear that the intent of the drafters, when the General Assembly invoked fiscal problems, fiscal difficulties, not having enough money, it was absolutely clear that that was not a basis that could be relied upon. We get the ultimate scenario, the doomsday scenario, as an argument. That argument simply doesn't apply here. That's not the situation. That's not the case before this Court. The case before this Court is an invocation of the General Assembly concerning fiscal problems, an adequate basis for ignoring a constitutional provision. And the emphatic answer to that is no. I hope I've answered that. So you, in contrast to your opponent, are not saying that a remand is necessary to address the issue of reasonability of the actions of the legislature? Absolutely not, Your Honor. A remand is unnecessary. The Circuit Court correctly ruled as a matter of law, construing all the things I've talked about, the plain words, the intent of the drafters, the case law from this Court, from Felt before that, Crouse, the appellate court decision by Justice, soon to be Justice Stamos of the Supreme Court, but from Felt to Canerva, the cases, the cases tell you how this clause should be interpreted and what it means. And the cases they rely on concerning the contracts clause, none of them have ever overridden a provision of a constitution. We're talking about statutes, about contracts, but never a provision of a statute, of a constitution. And that's been the case for the history of this Court from the time of the Civil War in merchant savings, loan, and trust. During the Great Depression, cases like Lyle and the appellate court case of Northrop, in all the benefit reduction cases of this Court, Felt, Budell, Canerva, Canerva is right on point. This Court was confronted with whether or not insurance benefits were a part of pension benefits, and when it said yes, there was no other alternative. That's it. Those benefits could not be diminished. Even the dissenting justice agreed with that principle, with the fact that if it belonged as a benefit, it could not be diminished. Let me get to the implicated, the reserve sovereign powers. In arguing that, the state misconstrues the entire concept of federalism. It's misguided in arguing that the General Assembly's police power can never be withdrawn by the people through the Constitution. It's important to note that in support of this argument, on page 18 of its reply brief, the state quotes a decision of this Court going back to 1884. Parker versus people of Illinois. The proposition they quote is this. The police power is one of the great purposes for which the state government was brought into existence. The state fails to furnish to this Court a sentence which followed that by two sentences. This quote, and this is determinative in this case. Quote, this power, and they're referring to the police power, can only be destroyed or withheld by the people when forming and adopting a Constitution. That's exactly what happened in 1970 when the drafters formed this provision. And when the people exercised their prerogative in voting for it, and thereby withdrawing the power of the General Assembly to diminish or impair pension benefits. By the exercise of their reserve power, by the exercise of their police power, by the exercise of any power that the General Assembly might have. It simply can't be done when we're talking about a constitutional provision. The New York case of Flushing National Bank that we've cited. And New York is relevant because our constitutional provision, the Pension Protection Clause, is based on that. In that case, Flushing National, also a case involving fiscal difficulties, great fiscal difficulties for New York. The Flushing National said, quote, the police power which may override statutes is not a higher law which transcends constitutions as well. The combination of Flushing and Parker, the very case they cited, is determinative here. The state cites not a single case in which a provision in a state's constitution was itself held to be unconstitutional on the basis that it restricted police powers. And I see my time is up. I need to be considerate of the time allotted to Mr. Madoff. Thank you. May it please the Court. Let me start by saying I'm Aaron Madoff. I represent the State University Annuitants Association, members of the State University Retirement System. Let me start by saying that I agree with what my brother, Judge DeVito, has set forth. It is clear that the Pension Clause and the pensions are not subject to the police power. You asked Judge DeVito, Justice Garman, does the Pension Clause allow police powers under any circumstances? The State has complained that this is an absolutist interpretation that we take. I've seen arguments that we can look at the federal constitution and say the first thing we need to do is make sure that the police powers are not subject to the police powers. That section of the Illinois Constitution says that you shall act responsibly. The Illinois Constitution tells us when there are exceptions. The Pension Clause, as Judge DeVito just explained, is clear and unequivocal. And when we say absolute, a constitution is not a guideline. The Constitution tells us how we limit the power of the government. And I turn to this Court's opinion just last year in Kinnerva. You said we may not rewrite the Pension Protection Clause to include restrictions and limitations that the drafters did not express and the citizens of Illinois did not approve. Those limitations are not in the Pension Clause. You can find them in various other clauses. Section 4 is the freedom of speech. You can find them in a number of other clauses that I cited in our brief. The state also suggests that there is no difference between diminish and impair. I think that the best case to describe that to us is Justice Freeman's concurrence dissent in Splodowski 1, which quite specifically says that when we talk about the violation that we cannot impair in the second clause, that that is coextensive with the Contracts Clause. But that case was about a failure to fund, taking money out of the fund. And diminish has a different meaning. Diminish says we are going to guarantee that people get the pensions. Those were the words of Delegate Green and Delegate Kinney. And that guarantee tells us the purpose behind it and the Pension Protection Clause itself does not have an exception. It's not the right to bear arms except that we have a police power. There are no exceptions there. Let me turn very briefly to what happens if this court says that the state can come back and say we have a fiscal problem. We're going to exercise the police powers and not pay on contracts where we own money. The state started out talking about the emergency that we're going to have and even in their brief. One of their concerns is collapsed bond ratings. What's going to happen to the bond ratings in the $50 billion bond market of Illinois state bonds out there if people are suddenly concerned that the state can say police power and not pay those bonds? What kind of a message would an opinion from this court saying that the state can come in and create the problem? I hesitate to say the Lizzie Borden defense, but I've killed my parents, have mercy on me, I'm an orphan. This is a situation of the state's making. What credit will the state have as we go forward on any other contract that it has? I think that my brother, Judge DeVito, has covered the highlights. If there's anything that the court has. Doesn't appear so. I thank you for the time. Ms. Shapiro, in your concluding statement, if I understood correctly, you said there may be a federal constitutional concern because the delegates gave away sovereign power. Yes, sir. It's my understanding of American theory of government that all power flows from the people, and as Mr. DeVito indicated, this is where the sovereign power resides. The people give voice to their sovereign power through the Illinois Constitution, and it was back in 1828 in one Illinois volume where this court said, from the decrees of the Constitution, there can be no appeal for it emanates from the highest source of power, the people. My question is this. If the sovereign power resides in the people and the people adopt the Constitution, which specifically provided for a pension clause having different wording than the contract clause, the pension clause must mean something, and secondly, the fact that with regard to the right to keep and bear arms, there was a particular reservation of the police power. Does that not indicate what the people, the sovereign, has given to the legislature to act within? Let me answer that question in two parts. First, the part as to whether or not the state can completely alienate its police powers. The United States Supreme Court said in Stone in 1879 that the people themselves cannot do so. And this court in Mills in 1845 said that the state may not alienate its police powers. So while certainly the state, the Constitution restricts the state's ability to act, it cannot give away certain absolutely core and fundamental attributes of sovereignty. And the ability to protect the public welfare in extreme situations is one of those. Now, as to why the pension clause is a standalone clause and different from the contract clause, I've already talked about where the wording of the clause comes from and why New York, from which we took the clause, had specific reasons for the words that it used. But in addition, if you read the debates, you'll see that this concern about home rule and municipal workers not being able to, municipalities being able to eliminate pensions for municipal workers, came about after the Bill of Rights had been voted on on first reading. And the contract clause of our Constitution resides in our Bill of Rights. And if you look at what Delegate Kinney says, Delegate Kinney says, well, I wasn't sure the best way to do this. And I went to the committee, one of the committees for advice, and this is how she was advised to proceed. Nobody, not once, says when talking about whether this would be better off added to the contract clause. Nobody, not once, says, well, we don't want to do that because the protections wouldn't be strong enough. That is, there's deafening silence as to that. Instead, the apparent reason for this clause to be standalone has to do with the order in which things happened at the convention. I'd like to talk a little bit about absolute language and the contract clause. The contract clause is written in absolute language. Both the federal and the Illinois contract clause say with no exceptions that impairment of contract, that no law shall be passed impairing the obligations of contract. But both this court and the United States Supreme Court for more than a century and a half have said that we don't read that clause as absolute. So when Mr. DeVito says there's never been a case that says that the police powers can come into play in tension with a constitutional guarantee, that's not true. There's 150 years of case law addressing the contract clause. Now, we disagree that what is happening is that there is an exception or something is being overridden in the Constitution. Rather, instead, we believe that the delegates chose their words, chose a contractual relationship, deliberately in order to establish the ordinary provisions of contract law, in order to incorporate that. They use the words of guarantee and promise when they talk about this in the debates. That's the way people talk about contracts. When we make a contract, we promise something to each other. We don't add all the provisions and limitations that contract law supplies. But those are read into the contract. And that's the context in which the delegates are speaking. Again, the state's ability to act here is not unlimited, even under police powers. It's not unlimited? No. In your brief, you state that if this court agrees with your argument, again, this is a quote, this court will not be granting the state a license to modify its own contractual obligations whenever it merely prefers not to fulfill those obligations. But isn't that exactly what we would be doing? If the court holds that the state can invoke its police powers to violate core constitutional provisions to respond to an emergency that arguably the state itself created, then aren't we giving the state the power to modify its contractual obligations whenever it wants? You know, for instance, the state could simply fail to fund the pension systems altogether and then claim an emergency. This court would be providing the state under the pension clause exactly the same power that it already has under the contract clause. The state has the power under the contract clause to alter its obligations pursuant to its police powers under the correct circumstances. Well, what was the import of your language that it will not be granting the state a license to modify its own contractual obligations? At will. It is not something that the state can just decide to do. It has to have particularly good reasons to do it. Not to be redundant, but if the reason is that it creates an emergency that now it can invoke the police power, why isn't that tantamount to giving the state a license to modify its own contractual obligations for any reason? The evidence that is in the record is very clear that while underfunding historically contributes to part of the unfunded liability, it is only part. And it is not, in fact, a substantial part of the unfunded liability is due to two things. One is the Great Recession, and the other is the unexpected direction that inflation has taken over the years. The cost of living adjustments that are primarily at issue here are at 3% compounded annually. That was established in 1989. At the time... You point out that the act creates a judicial enforcement mechanism, right? You point that out in your brief. In thinking about that, couldn't the state simply invoke its police powers to avoid that requirement? Certainly if police powers can override a constitutional provision, it could override a statute, right? The state cannot invoke its police powers simply, ever. There has to be a substantial emergency, and the state's actions have to meet a relatively demanding standard. They have to be proportionate. They have to allocate the burdens of dealing with the emergency fairly. It has to be a targeted and tailored fix. I don't think there's really any dispute here that there is, in fact, a fiscal emergency in our state. Whether or not the state should be held solely responsible for that, or the General Assembly should be held solely responsible for that, is really a question for remand. The evidence in the record now does not support that conclusion. Do you have any cases that allow the exercise of police power to impair the obligations of contracts outside the regulatory milieu? Sure. For example, we cite in our brief, on page 23 of our opening brief in the footnote, we cite three cases involving teachers' unions and wage freezes or pension cuts. In all three of those cases, one from the Second Circuit, one from the Fourth Circuit, and one from the District Court of Maryland, the courts found that under the fiscal emergencies faced by the jurisdictions there, it was appropriate to cut pensions or to impose a wage freeze that the contracts with the teachers otherwise would not provide. Thank you. As I said, I don't think there's really any dispute that the state has a fiscal emergency. The question is how to address that. Our plaintiffs, we are one, said in 2012 that there's no doubt that a long-term pension solution is a long-term fiscal solution that must involve truly shared sacrifice. But their position today is that there can be no shared sacrifice. Their position today is that any amount of money that might be owed through the original pension code must be paid, no matter what the other circumstances that the state faces might be. So again, in conclusion, we ask that you remand the case to the Circuit Court so that it can consider this evidence, so that it can consider whether, in fact, the state has responded appropriately to a fiscal emergency. Thank you. Thank you. Case number 118585 in Repension Reform Litigation, Doris Heaton et al. versus Pat Quinn, Governor of Illinois, Appellants, will be taken under advisement as agenda number 7. Ms. Shapiro and Mr. DeVito, Mr. Madoff, thank you for your arguments today. Mr. Marshall, the Illinois Supreme Court stands adjourned to reconvene on Tuesday, March 17th at 9.30 a.m.